FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 20 2024

BY: _____ TAMMY H. DOWNS, CLERK
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

Allstate Insurance Company,

        Plaintiff,

    v.

John Mark Goings,

        Defendant.

Case No. 4:24-cv-00257-KGB

## PLAINTIFF ALLSTATE INSURANCE COMPANY'S VERIFIED COMPLAINT
## FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Allstate Insurance Company ("Allstate"), by and through its undersigned attorneys, alleges as follows for its Complaint against Defendant John Mark Goings ("Goings"):

## NATURE OF THE ACTION

1.    This action is the result of Defendant Goings' failure to comply with certain promises he made and obligations he owes Allstate. Specifically, Goings executed an "Allstate R3001C Exclusive Agency Agreement" ("Goings Agreement") with Allstate on August 1, 2018 (attached as Exhibit A). The Agreement allowed Goings to market and sell Allstate products and services (jointly, "products"), to receive Allstate Confidential Information (defined below), and to receive compensation for the sale of Allstate products.

2.    Under his Agreement, Goings agreed that, for one year following the termination of his relationship with Allstate, he would not solicit the purchase of products in competition with those sold by Allstate: (a) with respect to any person, company, or organization to whom Goings, or anyone employed by Goings' Agency, sold insurance or other products at Allstate; (b) with respect to any Allstate customer known by Goings as a result of his or his Agency's access to Allstate Confidential Information; and (c) from any office or business site located within one mile of Goings' Exclusive Allstate Agency ("Allstate Agency") location.

1

24026223 v3

This case assigned to District Judge _Baker_
and to Magistrate Judge _Ervin_

3.     The Agreement further required Goings to acknowledge that he would be granted access to Allstate Confidential Information, that Allstate Confidential Information is the property of Allstate, and that he would not disclose Allstate Confidential Information to any third party or permit any third party to access Allstate Confidential Information.  Goings also agreed to return all Allstate property, including Allstate Confidential Information, upon termination of his relationship with Allstate.

4.     Effective July 31, 2023, Goings' Agreement and his relationship with Allstate terminated.

5.     Allstate recently learned that Goings is working for a competing insurance agency and soliciting Allstate customers to terminate their relationships with Allstate and purchase competing insurance products.  Goings' solicitations caused Allstate to lose a significant amount of customers.

6.     Worse yet, an internal Allstate investigation revealed that between July 26, 2023 and July 31, 2023, or the five days leading up to his termination, Goings downloaded multiple lists of confidential Allstate customer information.

7.     Based on this download activity, the large number of customer solicitations, and the significant loss of Allstate customers, Goings is using stolen Allstate Confidential Information to solicit Allstate customers and illegally compete with Allstate.

8.     Goings' actions are a clear violation of his Agreement and the law.  Consequently, Allstate now brings suit against Goings for breaches of his Agreement, misappropriation of Allstate trade secrets, and tortious interference.  In doing so, Allstate requests that this Court enter an order enjoining Goings from continuing his knowing and intentional breaches of his Agreement, and award Allstate damages and attorneys' fees for Goings' unlawful acts.

2

9.      More specifically, Allstate requests that this Court enter an order (1) enjoining Goings, and anyone acting in concert with him, from soliciting Allstate customers who were customers of the Allstate Agency or customers whom Goings knew about through his relationship with Allstate, (2) compelling Goings to return all Allstate property, including all Allstate Confidential Information, in his custody, possession or control to Allstate, (3) enjoining Goings and anyone acting in concert with him, from using, possessing, or accessing Allstate Confidential Information, (4) awarding Allstate compensatory and punitive damages for Goings' intentional acts, and (5) awarding Allstate its reasonable attorneys' fees as provided for under the Agreement and the law.

## THE PARTIES AND RELEVANT PERSONS

10.     Allstate Insurance Company ("Allstate") is an Illinois corporation with its principal place of business located in Northbrook, Illinois.

11.     John Mark Goings is a citizen of the State of Arkansas and resides at 20 Inverness Circle, Little Rock, Arkansas 72212-2928.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this dispute, pursuant to 28 U.S.C. § 1331, because Allstate's claims against Goings under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1833, *et seq.*, raise a Federal question. Allstate's remaining claims fall within the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, because the claims are so related to the Federal question that they form part of the same case or controversy.

13.     Alternatively, the Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because this action and controversy is between citizens of different states and exceeds the sum or value of $75,000.00, exclusive of interest and costs.

24026223 v3

14.     This Court has personal jurisdiction over Goings because he is a citizen and resident of Arkansas.  Venue is proper in the United States District Court for the Eastern District of Arkansas, pursuant to 28 U.S.C. § 1391(b), because Goings resides in this District, a substantial part of the events giving rise to Allstate's claims occurred in this District, and the property Allstate seeks to be returned is located in this District.

## BACKGROUND

### Allstate's Business and Hiring of Independent Agents and Service Providers

15.     Allstate is one of the nation's leading providers of insurance products to individuals and businesses.  Among other things, Allstate provides automobile insurance and property and casualty insurance to individuals and businesses.

16.     In addition to providing these products directly, Allstate appoints independent exclusive agents ("Exclusive Agents"), through its Exclusive Agency Program, to sell Allstate products.

17.     Allstate rigorously screens its Exclusive Agents to ensure that the agents are qualified to represent and sell Allstate products, have the proper tools and facilities to analyze and meet customer needs, and can furnish customers with appropriate insurance solutions.

18.     Allstate expends substantial resources advertising, marketing, and promoting its products.

19.     The Exclusive Agents benefit directly and indirectly from Allstate's advertising, marketing and promotional efforts, as well as from Allstate's goodwill, reputation and name recognition.  These efforts and expenditures allow the Exclusive Agents to develop and cultivate customer accounts and relationships on behalf of Allstate.

4

20.     Allstate relies heavily upon repeat business and renewal of policies to maintain its competitive advantage in the highly competitive insurance industry. Maintaining goodwill and a solid business reputation with its customers and insureds is a critical component of Allstate's success. Indeed, because Allstate's business is a service business, the relationship that each Exclusive Agent has with Allstate customers is highly dependent on the attention and excellent service given to the customers on an ongoing basis, and the continued trust the customers place in Allstate as a leading provider of such services.

### Protection of Allstate Confidential Information

21.     Allstate customers entrust Allstate and its Exclusive Agents to safeguard and protect their information, which includes information relating to, among other things, their personal data, types of policies, amount of insurance, premium amounts, description and location of assets and property, claims histories, insurance needs, pricing information, and other insurance coverage information, from unauthorized use or disclosure.

22.     Allstate protects its information (described in the paragraph above) by, among other things: limiting the disclosure and use of this information to only the Exclusive Agent who need this information to sell Allstate products; educating the Exclusive Agents about the requirement and necessity of keeping this information confidential; restricting access to this information by limiting access to computer networks and requiring the use of passwords to access the information; and, as discussed above, requiring the Exclusive Agents to execute written agreements that protect against the misuse and improper disclosure of Allstate Confidential Information. Indeed, Exclusive Agents do not have access to Allstate Confidential Information before executing their agreements with Allstate.

24026223 v3

23.     Consequently, all Exclusive Agents, pursuant to their agreements with Allstate and while performing services under their agreements, acknowledge that they will have access to Allstate Confidential Information, promise to not disclose Allstate Confidential Information to anyone not authorized to receive it, and confirm that they will not use Allstate Confidential Information for their own benefit or for any improper purpose.

24.     Exclusive Agents agree, upon termination of their relationship with Allstate, to continue treating Allstate Confidential Information as confidential, not disclose, either directly or indirectly, Allstate Confidential Information to any third party, and immediately return all Allstate Confidential Information to Allstate.

25.     Hence, Allstate's Confidential Information is not available to the general public and is closely guarded by Allstate. Allstate keeps such information strictly confidential in order to protect its customers' privacy and to maintain a competitive advantage in the highly competitive insurance business.

**Goings Enters into the Agreement to Solicit and Sell Allstate Products**

26.     After proceeding through Allstate's rigorous screening process, Goings became an Exclusive Allstate Agent on or about August 1, 2018. (See Agreement, Ex. A).

27.     As an Allstate Exclusive Agent, Goings solicited potential and existing Allstate customers to purchase Allstate products, and service existing Allstate customers' needs, from his Allstate Agency location.

28.     As explained below, in consideration of Goings' access to existing and potential Allstate customers and Allstate Confidential Information, Goings, pursuant to the Agreement, agreed to protect Allstate Confidential Information and to abide by certain reasonable restrictive covenants.

6

29.    Under his Agreement, Goings acknowledged that the following information is Allstate "confidential information" and property (referred to herein as "Confidential Information"):

> business plans of [Allstate]; information regarding the names, addresses, and ages of policyholders of [Allstate]; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by [Allstate] as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of [Allstate] that is not otherwise lawfully available to the public.

(Ex. A, § IV(D).)

30.    Pursuant to Section IV(D) of the Agreement, Goings agreed that he would not, at any time or in any manner, directly or indirectly, use Allstate Confidential Information for any purpose other than to carry out the provisions of the Agreement. (Ex. A, § IV(D).)

31.    Pursuant to Sections IV(D) and XVIII(B) of the Agreement, Goings acknowledged that all Confidential Information he was provided and had access to as an Allstate Exclusive Agent would at all times remain Allstate property and was to be returned to Allstate upon termination of the Agreement and his relationship with Allstate. (Ex. A, §§ IV(D), XVIII(B).)

32.    Pursuant to Section XVIII(D)(1-3) of the Agreement, Goings agreed that, for a period of one year following termination of the Agreement, he would not solicit the purchase of products competitive with those sold by Allstate:

- With respect to any person, company, or organization to whom [Goings] or anyone acting on [Goings'] behalf sold insurance or other products or services on behalf of [Allstate] and who is a customer of [Allstate] at the time of termination of the Agreement;

7

- With respect to any person, company, or organization who is a customer of [Allstate] at the time of termination of this Agreement and whose identity was discovered as a result of [Goings'] status as a[n Allstate] agent or as a result of [Goings'] access to [Allstate] Confidential Information[1]; or

- From any office or business site located within one mile of [Goings' Exclusive Allstate Agency] at the time the Agreement is terminated.

(Ex. A, § XVIII D(1-3).)

33.    Goings recognized that a breach of any of the provisions in his Agreement would "cause irreparable damage to [Allstate's] business and that such damage will be difficult or impossible to measure." (Ex. A, §§ IV(F), XVIII(F).)

34.    Accordingly, Goings agreed that if he breached any of the obligations under the Agreement, then Allstate would be "entitled to an order granting injunctive relief from any court of competent jurisdiction," in addition to other rights and remedies. (*Id.*)

35.    Goings also agreed that Allstate would be "entitled to an award of reasonable attorneys' fees in the event that [Allstate] is successful in an application for injunctive relief or in an action based upon the breach" of any of the terms set forth in the Agreement. (*Id.*)

**Goings Breaches His Agreement With Allstate**

36.    Pursuant to his Agreement, Goings agreed that, after his relationship with Allstate terminated, he would: (a) immediately return all Allstate Confidential Information to Allstate; (b) not solicit Allstate customers for one year; and (c) not solicit the sale of products that compete with Allstate from any location that is within one mile of the Allstate Agency.

37.    Goings' Agreement and his relationship with Allstate terminated on July 31, 2023.

38.    As a result, Goings was required to return all Allstate Confidential Information to Allstate by July 31, 2023.

---

[1] The Allstate customers identified in paragraph 32 are collectively referred to as "Allstate customers."

39.    Naturally, he was also prohibited from using, possessing, or accessing Allstate Confidential Information after July 31, 2023.

40.    Similarly, Goings is prohibited from soliciting Allstate customers or working for a competing insurance agency within one mile of the Allstate Agency until after July 31, 2024.

41.    Unfortunately, Goings is ignoring his post-termination obligations in several different ways.

42.    First, Goings retained Allstate Confidential Information after July 31, 2023.

43.    Specifically, between July 26, 2023 and July 31, 2023, Goings downloaded multiple lists of confidential Allstate customer information.

44.    Goings had no reason or legal basis for downloading multiple lists of confidential Allstate customer information in the days before the Goings Agreement terminated.

45.    Indeed, the only reason or basis for downloading and retaining Allstate Confidential Information after the Goings Agreement terminated is to use the information to solicit Allstate customers on behalf of himself and his new insurance agency.

46.    Hence, Goings downloaded and retained Allstate Confidential Information after the Goings Agreement terminated in order to use the information to solicit Allstate customers on behalf of himself and his new insurance agency.

47.    Second, Goings is actively soliciting Allstate customers. Based upon information and belief, Goings is using the downloaded and stolen Allstate Confidential Information to facilitate these solicitations.

48.    Goings' solicitations of Allstate customers and violations of his Agreement have been brazen. Specifically, and upon information and belief, Goings is soliciting Allstate customers by phone, email, and in person to purchase products that compete with Allstate products.

9

49.    Not surprisingly then, since Allstate terminated its relationship with Goings, Allstate customers terminated their Allstate products and, upon information and belief, purchased competing products through Goings.

50.    On February 5, 2024, Allstate served Goings with a letter demanding that he (a) immediately stop soliciting Allstate customers, (b) immediately stop using and return any Allstate Confidential Information in his possession, custody or control, and (c) affirm in writing that he will comply with the duties and obligations he still owes Allstate.  (A copy of Allstate's February 5, 2024 letter is attached as Exhibit B.)

51.    The letter also informed Goings that Allstate suspended his termination payment ("TPP") that he was eligible to receive contingent upon his compliance with the restrictive covenant and confidentiality provisions in the Agreement.  Further, the letter informed Goings that Allstate may seek to recover any TPP he received while in violation of the Agreement.

52.    Unfortunately, and at this time, Goings refuses to stop soliciting Allstate customers and selling products that compete with Allstate.

53.    Goings also refuses to return Allstate Confidential Information to Allstate.

54.    Lastly, Goings refuses to compensate Allstate for the Allstate customer policies he illegally solicited.

55.    Put another way, Goings is ignoring the duties and obligation he owes Allstate.  He is also ignoring the duties and obligations he owes Allstate under the law.

**Irreparable Harm to Allstate**

56.    Goings is harming Allstate's legitimate business interests, including its goodwill and customer relationships, by soliciting Allstate customers, and offering insurance products competitive to those offered by Allstate.

57.     Additionally, Goings is still in possession of Allstate Confidential Information, and the only reason for Goings to possess Allstate Confidential Information is to use Allstate Confidential Information on behalf of himself or his new insurance agency.

58.     Consequently, it is both probable and imminent that an existing or prospective customer may purchase insurance products from Goings instead of from Allstate.

59.     It is also both probable and imminent that Allstate's Confidential Information is at significant risk and exposure.

60.     Injury to Allstate is therefore both probable and imminent because Goings clearly intends to continue violating his Agreement and using Allstate Confidential Information.

61.     Accordingly, Allstate is suffering irreparable harm, and injunctive relief is necessary and appropriate to prevent further damage to Allstate.

## COUNT I
## (Breach of Contract)

62.     Allstate repeats and realleges each and every allegation contained in paragraphs 1 through 61 of the Complaint, as if fully set forth herein.

63.     On August 1, 2018, Goings entered into his Agreement with Allstate.

64.     The Agreement is a valid and enforceable contract.

65.     Under the Agreement, Goings promised, for a period of one year following the termination of the Agreement, to not solicit the purchase of products competitive with those sold by Allstate (a) to any Allstate customer or (b) from any location within one mile of the Allstate Agency.

66.     Under the Agreement, Goings promised, upon termination of the Agreement, to immediately return all Allstate Confidential Information and property to Allstate.

11

67.     Under the Agreement, Goings further promised to not use Allstate Confidential Information for any purpose other than carrying out the provisions of the Agreement.

68.     The post-termination covenants found in the Agreement are reasonable in scope and duration and are necessary to protect Allstate's legitimate business interests in its Confidential Information, goodwill, and longstanding customer relationships.

69.     Allstate has performed all of the duties and obligations it owes Goings under the Agreement.

70.     Goings breached the Agreement, and continues to breach the Agreement, by, among other things, soliciting Allstate customers and soliciting the purchase of competing insurance products.

71.     Goings breached the Agreement, and continues to breach the Agreement, by, among other things, retaining and using Allstate Confidential Information.

72.     Goings breached the Agreement, and continues to breach the Agreement, by, among other things, downloading and stealing Allstate Confidential Information to assist in solicitations of Allstate customers.

73.     Goings also breached the Agreement by transferring Allstate customers and policies out of Allstate and to an Allstate competitor.

74.     Allstate has incurred significant damage as a result of Goings' breaches of the Agreement.  Goings' illegal solicitations and actions damaged and are continuing to damage Allstate's goodwill and customer relationships.  Allstate's damages are in excess of $75,000.00.

75.     Moreover, Goings' breaches of the Agreement are continuing.  Allstate is therefore subject to continuing irreparable harm, economic injury, and damage to its goodwill and customer relationships.

76.    Allstate has no adequate remedy at law and, unless injunctive relief is granted, Allstate will continue to be irreparably harmed by Goings' breach of his Agreement in a manner that is not fully compensable by money damages.

77.    Allstate therefore requests that this Court grant injunctive relief against Goings that prohibits Goings from (a) soliciting Allstate customers and (b) using, accessing, or possessing Allstate Confidential Information.

78.    Allstate further requests that this Court order Goings to immediately return all Allstate property in the custody, possession, or control of Goings, including Allstate Confidential Information, to Allstate.

79.    Finally, Allstate is entitled to recover the attorneys' fees and costs Allstate incurs as a result of Goings' breaches of the Agreement.

<u>**COUNT II**</u>
**(Violation of the Arkansas Trade Secrets Act, Ar. St. § 4–75–601 *et seq.*)**

80.    Allstate repeats and re-alleges each and every allegation contained in paragraphs 1 through 79 of the Complaint, as if fully set forth herein.

81.    During the course of his relationship with Allstate, Goings was exposed to substantial amounts of Allstate Confidential Information.

82.    For instance, Goings had access to: Allstate business plans; information regarding the names, addresses, and ages of policyholders or prospective policyholders of Allstate; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings; policyholder information that is subject to privacy law; and claim information.

83.     The Confidential Information identified in paragraphs 21, 29, and 82 is not available to the general public and is closely guarded by Allstate.  Allstate keeps such information strictly confidential in order to maintain an advantage in the highly competitive insurance business.

84.     This information is considered a trade secret under the Arkansas Trade Secrets Act ("ATSA"), Ar. St. § 4–75–601 *et seq.*, because Allstate derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

85.     The economic value of the Allstate trade secrets/Confidential Information that Goings had access to under his Agreement is over $500,000.

86.     The ATSA permits injunctive relief for actual or threatened trade secret misappropriation.

87.     Goings misappropriated Allstate trade secrets when he downloaded Allstate Confidential Information immediately before the Goings Agreement terminated and then using that information to solicit Allstate customers.

88.     Goings is also refusing to return Allstate trade secrets and his refusal to return Allstate trade secrets constitutes the threatened misuse of Allstate trade secrets and injunctive relief is therefore appropriate.

89.     Accordingly, Allstate requests that this Court enter an order enjoining Goings from using any Allstate Confidential Information, and from disclosing Allstate Confidential Information to anyone not authorized to receive the Confidential Information.

90.     Allstate also requests that this Court enter an order requiring Goings to return any and all Allstate Confidential Information to Allstate, as he is required to do pursuant to the Agreement.

91.     In addition, Goings' actions have damaged Allstate's goodwill, reputation, and legitimate business interests.

92.     Allstate is therefore entitled to compensatory and exemplary damages in an amount to be proven at trial, as well as reasonable attorneys' fees.

93.     Finally, Goings' misappropriation of Allstate's trade secrets was willful and malicious.

94.     Allstate therefore requests an award of compensatory damages, exemplary damages, and reasonable attorneys' fees as a result of Goings' willful and malicious misappropriation of Allstate trade secrets.

## **Count III**
### **(Violation of Federal Defend Trade Secrets Act, 18 U.S.C. § 1833 *et seq.*)**

95.     Allstate repeats and realleges paragraphs 1 through 94 of the Complaint, as if fully set forth herein.

96.     During the course of his relationship with Allstate, Goings was provided access to substantial amounts of Allstate Confidential Information, including the Confidential Information identified in paragraphs 21, 29, and 82.

97.     Allstate Confidential Information is not available to the general public and is closely guarded by Allstate. Allstate keeps such information strictly confidential in order to maintain a competitive advantage over competitors.

98.     Allstate Confidential Information is considered a trade secret under the Defend Trade Secrets Act, 18 U.S.C. § 1833, *et seq.* ("DTSA"), because the information is not generally

15

known outside of Allstate's business, the information is not generally known by employees and others involved in Allstate's business, Allstate has taken reasonable measures to guard the secrecy of the information, the information is of great value to Allstate and its competitors, Allstate invested significant amounts of time and money in developing the information, the information cannot easily be acquired or duplicated by others, and because Allstate continuously uses the information in its business.

99.    Goings has contractual obligations to return Allstate Confidential Information to Allstate immediately upon termination of his Agreement.

100.    Goings, however, ignored (and continue to ignore) his contractual obligations by downloading and maintaining possession of Allstate Confidential Information after the Goings Agreement terminated, using the Confidential Information to unfairly compete with Allstate, and passing the Confidential Information along to third parties who are not authorized to receive, possess, or access Allstate Confidential Information.

101.    Unless restrained, Goings will continue to use, divulge, disclose, acquire and/or otherwise misappropriate Allstate Confidential Information.

102.    Furthermore, actual or threatened misappropriation of Confidential Information may be enjoined under the DTSA.

103.    It is axiomatic that if Goings is actively using Allstate Confidential Information and ignoring the terms of the Agreement, then Goings has no intention of complying with the DTSA.

104.    Consequently, Goings' actions constitute the actual and/or threatened misuse of Allstate Confidential Information.  Injunctive relief against Goings is therefore appropriate.

105.    Naturally then, Allstate requests an order enjoining Goings from using Allstate Confidential Information and from disclosing Allstate Confidential Information to anyone not authorized to receive the Confidential Information.

106.    Allstate further requests an order requiring Goings to return any and all Allstate Confidential Information to Allstate.

107.    Finally, Goings' misappropriation of Allstate Confidential Information has been willful and malicious, and Allstate has incurred significant damages as a result of Goings' misappropriation.

108.    Goings' actions have also damaged Allstate's good will, reputation, and legitimate business interests.

109.    Allstate is therefore entitled to recover not only compensatory damages, but also punitive damages and attorneys' fees resulting from Goings' wrongful misappropriation of Allstate Confidential Information.

## COUNT IV
### (Tortious Interference)

110.    Allstate repeats and realleges each and every allegation contained in paragraphs 1 through 109 of the Complaint, as if fully set forth herein.

111.    Goings was and is aware of the contractual relationship between Allstate and Allstate's customers, as well as Allstate's expectancy in developing relationships with potential customers.

112.    Goings knew and understood that Allstate's contractual relationship with its customers would continue after Goings' Agreement terminated.

17

113.    Pursuant to his Agreement, Goings was obligated not to solicit or otherwise interfere with Allstate's customer relationships for a period of one year after the termination of his Agreement.

114.    Nevertheless, Goings solicited Allstate customers after his Agreement terminated in order to have Allstate customers terminate his relationship with Allstate.

115.    Hence, Goings knowingly, intentionally, willfully, and maliciously interfered with Allstate's customer relationships within a year from his termination.

116.    Goings' conduct was not privileged or justified.

117.    Allstate has incurred significant damages as a result of Goings' interference with Allstate's contractual relationships. Allstate has suffered the loss of customers and potential customers. Goings' actions have also damaged Allstate's goodwill, reputation, and legitimate business interests.

118.    As a direct and proximate result of Goings' tortious interference, Allstate has been damaged in an amount to be determined at trial and is entitled to the recovery of punitive damages as well.

**WHEREFORE**, Plaintiff Allstate Insurance Company respectfully requests that this Court:

1.    Enter an injunction enjoining and restraining Goings, and his agents, representatives, associates, employees, and all those acting in concert or participation with them, from:

(a)    soliciting the purchase of insurance products competitive to those offered by Allstate from any person Goings serviced or knew of through his relationship with Allstate; and

18

       (b)     using, accessing and/or possessing Allstate Confidential Information.

2.     Enter an order requiring Goings to return all Allstate Confidential Information and property in his possession, custody or control to Allstate;

3.     Enter judgment against Goings for compensatory damages in an amount to be determined at trial;

4.     Award Allstate the costs and expenses, including reasonable attorneys' fees, Allstate incurs as a result of Goings' breaches of his Agreement;

5.     Award Allstate the costs and expenses, including reasonable attorneys' fees, Allstate incurs as a result of Goings' intentional, willful and wanton violation of the Federal Defend Trade Secrets Act and the Arkansas Trade Secrets Act;

6.     Award Allstate punitive damages resulting from Goings' intentional, willful, and wanton violation of the Federal Defend Trade Secrets and the Arkansas Trade Secrets Act; and

7.     Award Allstate such other relief as the Court may deem just and proper.

*(THE REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK)*

24026223 v3

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Alex Luft, on behalf of Plaintiff Allstate Insurance

Company, verify under penalty of perjury that the foregoing statements in the Verified

Complaint are true and correct to the best of my knowledge, information and belief.

_Alex luft_
Alex Luft

Dated:  March 14, 2024

Dated:  March 19, 2024

Respectfully submitted,

MICHAEL MONTGOMERY (OH Bar 70922)
Benesch, Friedlander, Coplan & Aronoff LLP
127 Public Square, Suite 4900
Cleveland, OH 44114
Telephone:  216.363.6235
Facsimile:  216.363.4588
Email: mmontgomery@beneschlaw.com

J. SCOTT HUMPHREY (attorney admissions
application forthcoming)
KATIE M. BURNETT (*pro hac vice*
forthcoming)
Benesch, Friedlander, Coplan & Aronoff LLP
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone:  312.212.4949
Facsimile:  312.767.9192
Email:  shumphrey@beneschlaw.com
          kburnett@beneschlaw.com

*Attorneys for Plaintiff Allstate Insurance
Company*

24026223 v3

## **CERTIFICATE OF SERVICE**

I certify that on this ___ day of March, 2024, I electronically transmitted the attached

document to the Clerk's Office using the CM/ECF system for filing, and attach same for service

on the following:

John Mark Goings
20 Inverness Circle
Little Rock, Arkansas 72212-2928

_____
Michael Montgomery

21

# <u>EXHIBIT A</u>

B8407

# ALLSTATE R3001C EXCLUSIVE AGENCY AGREEMENT

This Agreement is between ALLSTATE INSURANCE COMPANY and such affiliates and subsidiaries as are named in the Supplement for the R3001 Agreement (referred to in this Agreement as "the Company") and _J Mack Guist Insurance Agency, Inc._ (referred to in this Agreement as "Agency").

The Company and Agency agree as follows:

**I.     AUTHORITY:**

A. Effective ___8 - 1___, ___2018___ the Company appoints Agency as its agent to represent the Company in the Exclusive Agency Program. Agency is authorized on behalf of the Company, during the term of this Agreement, to receive and accept, subject to such restrictions on binding authority as may be established by the Company, applications for insurance covering such classes of risks located in the state(s) of _Arkansas_ as the Company may from time to time authorize to be written. Agency is also authorized to sell products specified by the Company and through the companies specified in the Supplement for the R3001 Agreement (referred to in this Agreement as "Company Business"). The Company will own all business produced under the terms of this Agreement. Agency will not represent itself as having any authority other than that specifically granted to it by the Company. Agency will not alter any contract or incur any expense or obligation for the Company without prior written approval from the Company.

B. This Agreement is the sole and entire agency agreement between the Company and Agency, and it supersedes and replaces any prior employment, agency, or other agreement between the Company and Agency and any of its officers, directors, shareholders, members, and employees. This Agreement also supersedes any prior oral statements and representations by the Company and any prior written statements and representations by the Company in letters, manuals, booklets, memoranda, or any other format.

C. The Supplement for the R3001 Agreement ("Supplement") and the Exclusive Agency Independent Contractor Manual ("EA Manual"), and the Allstate Agency Standards ("Agency Standards") as they may be amended from time to time, are expressly incorporated in their entirety as part of this Agreement. The Company reserves the right to amend the Supplement, EA Manual, and Agency Standards at any time without prior notice to Agency, except that notice regarding changes to commission amounts will be given as indicated in Section XV.

D. The relationship between the Company and Agency and its officers, directors, shareholders, members, employees, and other persons working in connection with this Agreement, will be that of an independent contractor for all purposes. Agency will not represent that it has authority to act on behalf of the Company or enter into any contract on behalf of the Company, except for contracts of insurance or other contracts as expressly authorized by this Agreement.

E. Agency will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company. Agency may, however, write applications for insurance under an assigned risk, cooperative industry, or government established residual market plan or facility in accordance with the Company's rules and procedures.

1

F. The Company will determine in its sole discretion all matters relating to its business and the operation of the Company including, but not limited to, the following:

1. The determination of contract forms and provisions, premiums, fees, and charges for insurance and other Company Business;

2. The acceptance or rejection of any application;

3. The termination or modification of any contract or the refusal to renew any contract;

4. The limitation, restriction, or discontinuance of the writing or selling of any policies, coverages, lines, or kinds of insurance or other Company Business;

5. The obtaining of any licenses of the Company or the Company's withdrawal from any state, jurisdiction, or territory; and

6. The type and quality of customer service received by Company policyholders.

G. Agency represents and warrants that prior to the execution of this Agreement, Agency has provided to the Company the full names and addresses of its officers, directors and any persons who own any shares of or interest in Agency. Thereafter, Agency shall promptly furnish to the Company the full names and addresses of any new officers, directors, or owners.

II. **DUTIES AND CONDITIONS:**

A. Agency will act as an agent of the Company for the purpose of soliciting, selling, and servicing insurance and other Company Business in accordance with the provisions of this Agreement. As an agent of the Company, Agency will provide customer service, including the collection of payments, for any and all Company policyholders and will assist in claims administration in accordance with the Company's rules and procedures.

B. Agency will meet certain business objectives established by the Company in the areas of profitability, growth, retention, customer satisfaction and customer service. Agency will build and maintain a profitable book of business, assist the Company in its efforts to achieve market penetration for all forms of insurance offered by the Company and other Company Business, and service the Company's customers in a manner consistent with the Company's goodwill, reputation, and overall business strategy.

C. Agency will record, transmit, and process insurance and Company Business in the manner prescribed in the then current provisions of the Supplement.

D. Agency agrees to comply with any and all applicable federal, state, or local laws, rules, regulations and ordinances affecting its operation and warrants that Agency, its officers, directors, shareholders, members, and employees will maintain any required agent licenses in the state or states in which Agency is appointed to represent the Company.

E. This Agreement is being entered into with Agency in reliance upon and in consideration of the skills, qualifications, and representations of _John Mark Going_ (referred to in this Agreement as "Key Person"). Agency agrees that it will employ Key Person to provide services under this Agreement for its term.

F. The Company recognizes that Agency may, in its sole discretion, arrange to have business conducted at its sales location in Key Person's absence by its other employees or other persons and that the time during which Key Person is physically present at Agency's sales location is entirely in Agency's sole discretion. Key Person must, however, remain actively involved in the conduct of business at Agency's sales location.

G.  The Company shall at all times be entitled to conclusively rely upon the authority of Key Person (or in the event of the death or incapacity of Key Person, his executor or personal representative) to bind Agency and its officers, directors, shareholders and members, regardless of any directions received by the Company from any person or entity which conflict with directions received from Key Person, unless the Company is properly served with an order of a court of competent jurisdiction abrogating Key Person's authority and designating an alternate authorized representative to act on behalf of Agency under this Agreement.

H.  Agency agrees that the Company will have the authority to use the name of Agency or Key Person and the Key Person's signature, or facsimile thereof, on policy documents and customer communication materials.

I.  Agency agrees to maintain a professional business relationship with the Company, and, when requested, to meet with Company representatives at mutually convenient times to discuss various business topics. Agency also agrees that, because it is conducting business with the public under the Allstate name, Company representatives shall be permitted access to its sales location to review compliance with this Agreement during the business hours of that sales location.

J.  Agency agrees that, as requested by the Company, it will demonstrate its knowledge of the Company products it is authorized to sell, as well as of federal, state, or local laws, rules, regulations and ordinances affecting its operation. If Agency is unable to demonstrate its knowledge of any product, the Company reserves the right to deny Agency the authority, or withdraw Agency's existing authority, to sell that product, until Agency demonstrates such knowledge.

## III.   AGENCY EMPLOYEES:

A.  Agency has no authority to employ persons on behalf of the Company, and no employee of Agency will be deemed to be an employee or agent of the Company, such employees at all times remaining Agency's employees. Agency has sole and exclusive control over its labor and employee relations policies, and its policies relating to wages, hours, and working conditions of its employees. Agency has the sole and exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, and discharge its employees.

B.  Agency is solely responsible for all salaries and other compensation of all its employees and will make all necessary salary deductions and withholdings from its employees' salaries and other compensation. Agency is solely responsible for the payment of any and all contributions, taxes, and assessments, and all other requirements of the federal Social Security, federal and state unemployment compensation, and federal, state, and local withholding of income tax laws on all salary and other compensation of its employees.

C.  Agency will comply with all other contracts, federal, state or local laws, ordinances, rules, or regulations regarding its employees, including federal or state laws or regulations regarding minimum compensation, overtime, and equal opportunities for employment. This includes, but is not limited to, Agency's warranty and agreement to comply with the terms of the federal and state civil rights acts, Age Discrimination in Employment Act, Americans With Disabilities Act, Occupational Safety and Health Act, Immigration Reform and Control Act, and the Fair Labor Standards Act.

D.  Agency agrees and warrants that its employees, while working in connection with this Agreement, will comply with any and all applicable federal, state, or local laws, rules, regulations, and ordinances.

3

## IV.    COMPANY PROPERTY, CONFIDENTIALITY:

A.  The Company will furnish Agency such signs, forms, manuals, records, and other materials and supplies as the Company deems advisable to assist Agency. All such property and information furnished by the Company will remain the property of the Company. In addition, the Company will offer, at Agency's expense, such additional materials and supplies as the Company feels may be helpful to Agency.

B.  Agency agrees that it will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information or any information containing trade secrets concerning any matters affecting or relating to the pursuits of the Company, except upon direct written authority of the Company. Furthermore, upon termination of this Agreement, Agency agrees to treat as confidential and not to disclose, either directly or indirectly, to any third party any confidential information or trade secrets of the Company.

C.  Agency agrees that it will not disclose or grant access to any confidential information or trade secrets to any of its employees or other persons providing services for it in connection with this Agreement, unless such employee or other person has signed a copy of the Confidentiality and Non-Competition Agreement, attached as Appendix A if Key Person and Appendix B if other than Key Person. Appendix B is a sample copy of the electronic version of the document that must be transmitted to the Company.

D.  Confidential information includes, but is not limited to: business plans of the Company; information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. All such confidential information is wholly owned by the Company. Such confidential information may be used by Agency only for the purposes of carrying out the provisions of this Agreement.

E.  Any confidential information or trade secrets recorded on paper, electronic data file, or any other medium, whether provided by the Company or by Agency, is the exclusive property of the Company, as is any such medium and any copy of such medium.

F.  Agency recognizes that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. Agency agrees that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

## V.    SALES LOCATION:

A.  Agency may select its sales location, within a geographical area specified by the Company, subject to Company approval. Initially, Agency has selected the location at *#2 4 Main St. Cabotark* and such sales location has been approved by the Company. Agency agrees that it will not *72029* establish any additional sales location without the prior written approval of the Company. Agency acknowledges that it has no exclusive territorial rights in connection with its sales location.

4

B. Agency agrees to keep its sales location open for business as appropriate in the market to provide a proper level of customer service. As a minimum, Agency agrees to operate its sales location consistently with the Agency Standards.

C. Agency is authorized to sell insurance offered by the Company and Company Business only in the state containing its sales location and other states in which Agency has been authorized to act as a Company agent.

## VI.  ADVERTISING:

A. The Company will advertise its products and provide promotional material in accordance with its advertising policies. Agency may also advertise in its sole discretion, subject to the requirements in paragraph B. below.

B. Agency will submit all signs and advertising copy, including, but not limited to, sales brochures, display advertisements in telephone directories, newspaper advertisements, radio and television commercials, electronic media displays, all sales promotional plans and devices, and all other materials to the Company for approval, if they use or contain any reference to any service mark or trade name of the Company. Agency will not use any such advertising material or sales promotional plan or device without obtaining prior written approval from the Company. The Company has the right to disapprove any or all of the aforesaid advertising forms and other materials insofar as they, in the exclusive judgment of the Company, do not conform to Company policy regarding use of Company service marks or trade names; may subject the Company to liability or loss of goodwill; may damage the reputation of the Company or Company customer relations; may fail to adhere to the requirements of any federal, state, or local governmental rules, regulations, or laws; may fail to conform to community or Company standards of good taste and honest dealing; or may be detrimental to the business interests of the Company.

## VII.  SERVICE MARK AND TRADE NAME PROTECTION:

A. Agency agrees to cooperate fully in the quality control program conducted by the Company relating to the use of its service marks and trade names and the nature and quality of services rendered and goods distributed under its service marks and trade names. The Company will have the right to specify, delineate, or limit the services or goods in connection with which Agency may use any of its service marks or trade names. In the event that the nature or the quality of the services or goods in connection with which Agency uses any of the service marks or trade names of the Company is not acceptable to the Company, then the Company will have the right to require Agency to institute appropriate procedures to correct any deficiencies noted by the Company.

B. Agency agrees, at the request and expense of the Company, to assist the Company in protecting and enforcing the rights of the Company in and to any and all of its service marks and trade names which Agency may then be using.

C. Agency will not in any manner encumber, alienate, license, or transfer to any other entity any right whatsoever concerning the service marks or trade names the Company authorizes the Agency to use in the performance of this Agreement, except as permitted in Section XVI.

5

D. Agency recognizes that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. Agency agrees that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

## VIII.    EXPENSES:

Agency will be responsible for the payment of all expenses that it incurs in the performance of this Agreement including, but not limited to: expenses for its sales location, supplies not furnished by the Company, compensation of its employees or other assisting persons whom it engages, telephone, postage, and advertising expenses incurred at its direction, and all other charges and expenses.

## IX.    TELEPHONE:

All telephone numbers used in connection with business conducted pursuant to this Agreement are the property of the Company.

## X.    INDEMNIFICATION:

A. The Company will defend and indemnify Agency against liability, including the cost of defense and settlements, imposed on Agency by law for damages sustained by policyholders and caused by acts or omissions of the Company, provided that Agency has not caused or contributed to cause such liability by its acts or omissions. Agency agrees, as a condition to such indemnification, to notify the Company promptly of any claim or suit against it and to allow the Company to make such investigation, settlement, or defense as the Company deems prudent. The Company reserves the right to select counsel to represent Agency in connection with any such claim or suit. Agency also agrees to cooperate fully with the Company in any such investigation, settlement, or defense.

B. Agency will indemnify the Company against liability, including the cost of defense and settlements, imposed on the Company by law for damages sustained by any person and caused by the acts or omission of Agency, its officers, directors, shareholders, members, employees, including Key Person or other persons working in connection with this Agreement, provided that the Company has not caused or contributed to cause such liability by its acts or omissions. The Company agrees, as a condition to such indemnification, to notify Agency promptly of any such claim or suit against the Company. The Company reserves the right to select counsel to represent it in connection with any such claim or suit and to make such investigation or settlement as the Company deems prudent.

## XI.    INSURANCE:

A. Agency agrees that it will, at its sole expense, obtain and maintain during the term of this Agreement policies of insurance as described in the EA Manual, as may be amended from time to time. Such policies must be obtained from companies satisfactory to the Company and must be adequate to protect against all expenses, claims, actions, liabilities, and losses related to the subjects covered by the required policies.

B. Where specified, each policy must name the Company as an additional insured and must contain a severability of interest/cross liability endorsement. Each policy must also expressly provide that it will not be subject to material change or cancellation without at least thirty (30) days prior written notice to the Company.

6

    C.  Agency must furnish the Company with proof of insurance upon request by the Company. If, in the Company's opinion, such policies do not afford adequate protection for the Company, the Company will so advise Agency and if Agency does not furnish evidence of acceptable coverage within fifteen (15) days after being requested to do so by the Company, the Company will have the right to obtain additional insurance at Agency's expense and deduct the cost of such insurance plus a processing fee from monies owed Agency by the Company.

## XII.  FINANCIAL INFORMATION:

Agency shall maintain all books and records relating to the business under this Agreement including, but not limited to, all checkbooks, check registers, deposit receipts, and general ledgers for a period of not less than five years after the close of the fiscal year to which they relate. All of the foregoing records shall be open and available for inspection or audit at any time during Agency business hours without notice by the Company or its designated auditors and Agency shall have the duty to cooperate fully with the party(ies) making such inspection or audit.

## XIII.  POLICIES IN AGENCY'S ACCOUNT:

Policies which are credited to Agency's account are described in the Supplement. While this Agreement is in effect, the Company will leave in Agency's account all policies credited to such account so long as the policyholder resides within a state in which Agency is authorized to act as a Company agent, except that the Company may remove any policy from Agency's account at the request of a policyholder.

## XIV.  MONEY COLLECTED BY AGENCY:

All payments collected or received by Agency in the performance of this Agreement are the property of the Company, will be treated as trust funds, and will be promptly transmitted to the Company without deduction for any purpose in the manner specified by the Company. Agency must maintain accurate records and current remittance reports which may be inspected by the Company at any time without notice and which shall be submitted to the Company in accordance with its rules and procedures.

## XV.  COMPENSATION:

    A.  The sole compensation to which Agency will be entitled for services rendered pursuant to this Agreement will be the commissions set forth in the Supplement, as may be amended from time to time. All commissions will be paid solely to the Agency, except as described in Section XIX. below. The Company will pay Agency its commissions at the time and in the manner set forth in the Supplement. However, due to the inherent uncertainty of business conditions, the Company reserves the right to increase or decrease any commission amounts and to change the commission rules. If the Company changes commission amounts, it will provide Agency with written notice of the changes at least ninety (90) days prior to the date on which they are to become effective.

    B.  The Company may provide Agency with such bonuses, awards, prizes, and other remuneration based on performance, if any, as it may prescribe in its sole discretion.

    C.  If any application for insurance is rejected, or any policy is surrendered or canceled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium is reduced or any overpayment made to Agency, or if any premium paid is not earned by the Company, the commissions paid to Agency on the amount returned or credited to the policyholder, or the amount overpaid to Agency, will constitute an indebtedness of the Agency to the Company and will be charged to Agency or recovered from Agency by reducing any future commissions, awards, or bonuses due Agency.

## XVI.  TRANSFER OF INTEREST:

A.  Agency may not execute a transfer of its interest in this Agreement without the prior written approval of the Company. A transfer of interest in this Agreement is described in the Supplement and EA Manual and includes, but is not limited to, any sale, merger, or assignment, in whole or in part, directly, indirectly, or contingently, of this Agreement or any rights or obligations under it. Neither Agency, nor any shareholder or member of Agency, shall transfer any shares or interest in Agency, including, but not limited to, any sale, assignment, conveyance, or the granting of any lien, security interest, pledge, or mortgage thereof, without the prior written approval of the Company. Agency has the obligation to notify the Company of a proposed transfer and to request Company approval.

B.  Agency has an economic interest, as defined in this Agreement and the incorporated Supplement and EA Manual, in its Allstate customer accounts developed under this Agreement. Subject to the terms and conditions set forth in this Agreement and the incorporated Supplement and EA Manual, Agency may transfer its entire economic interest in the business written under this Agreement upon termination of this Agreement by selling the economic interest in the business to an approved buyer. The Company retains the right in its exclusive judgment to approve or disapprove such a transfer. Any failure to disclose and obtain the prior written approval of the Company for any transfer of Agency's interest in this Agreement or any share or interest in Agency shall constitute a breach of this Agreement and cause for termination of this Agreement.

C.  Approval of a proposed transfer of Agency's entire interest in this Agreement will be conditioned upon the termination of this Agreement and the execution of a then current agency agreement by the proposed transferee.

D.  Policies in Agency's account (Section XIII. above) will be transferred to an approved transferee.

## XVII.  TERMINATION OF AGREEMENT:

A.  This Agreement will be terminated automatically:

1.  On the effective date of any transfer of Agency's entire interest in this Agreement, whether approved or not, as described in Section XVI. above;

2.  Upon the death or permanent incapacity of Key Person;

3.  On the date Key Person ceases to be employed by Agency;

4.  Upon the loss of any required agent license of Agency or Key Person;

5.  Upon the dissolution of Agency; or

6.  Upon the surrender of, or the election not to renew, the Company's license to sell insurance in all lines in the state in which Agency's sales location is located or the discontinuation of the sale of insurance in the state.

B.  This Agreement may be terminated:

1.  At any time by mutual agreement of the parties in writing;

8

2. By either party, with or without cause, upon providing ninety (90) days prior written notice to the other, or such greater number of days as is required by law. Once written notice of termination has been given by either party, Agency will, immediately upon request of the Company, cease to act or to represent itself in any way as an agent or representative of the Company, but it will receive compensation pursuant to Section XV. from the Company for the period up to and including the specified termination date; or

3. Alternatively, by the Company, with cause, immediately upon providing written notice to Agency. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

**XVIII.    OBLIGATIONS UPON TERMINATION OF AGREEMENT:**

Except as otherwise provided in a subsequent agreement between Agency and the Company, upon termination of this Agreement, Agency agrees that:

A. Agency will not act or represent itself in any way as an agent or representative of the Company.

B. Agency will immediately return all property belonging to the Company, or dispose of it in such manner as the Company specifies.

C. Agency will immediately cease to use such telephone numbers referenced in Section IX. above and execute an Order of Transfer of Responsibility for such numbers in its or Key Person's name to the Company or to any party the Company designates, and Agency will immediately notify the telephone company of any such transfer. Agency will be responsible for all charges incurred up to the date of execution of the transfer.

D. For a period of one year following termination, neither Agency, nor any of its officers, directors, shareholders, members, or employees, including Key Person or any other persons working in connection with this Agreement, will solicit the purchase of products or services in competition with those sold by the Company:

1. With respect to any person, company, or organization to whom Agency or anyone acting on its behalf sold insurance or other products or services on behalf of the Company and who is a customer of the Company at the time of termination of the Agreement;

2. With respect to any person, company, or organization who is a customer of the Company at the time of termination of this Agreement and whose identity was discovered as a result of Agency's status as a Company agent or as a result of Agency's access to confidential information of the Company; or

3. From any office or business site located within one mile of the agency sales location maintained pursuant to Section V. of this Agreement at the time this Agreement is terminated.

In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph D. conflicts with any existing law, it will be applied to the extent permitted by such law.

E. Agency will immediately cease and desist from any and all use of Company service marks and trade names. Agency will immediately return to the Company all property in its possession or under its control bearing any Company service mark or trade name, or dispose of it in such manner as the Company specifies.

9

F. Agency recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Agency agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

G. Agency recognizes and acknowledges that each of the foregoing provisions of this Section XVIII. is reasonable and necessary to protect and preserve the legitimate business interests of the Company, its present and potential business activities, and the economic benefits derived therefrom. Agency and Key person recognize and acknowledge that the foregoing provisions are not an undue restraint on Agency or Key Person.

**XIX.     PAYMENT TO AGENCY UPON DISSOLUTION:**

If at any time following the Company's receipt of notice of Agency's dissolution, the Company shall be obligated under this Agreement to pay money to Agency, the Company is irrevocably authorized to pay such money to Key Person, or in the event of the death or incapacity of Key Person, his executor or personal representative, who shall be responsible to Agency's successors-in-interest for distribution of such payment to the persons or entities legally entitled thereto. Company shall have no liability whatsoever for any payments made pursuant to the foregoing authority regardless of whether Company has received any conflicting demand from any other person or entity, except for payments made by the Company in violation of an order of a court of competent jurisdiction properly served upon the Company which directs the Company not to make any such payment to Key Person and designates an alternate person or entity to which the Company is directed to make such payments.

**XX.     NOTICE:**

All notices will be deemed to have been given if personally delivered, sent by facsimile transmission, or mailed as follows:

If to the Company:

Allstate Insurance Company
ALLSTATE INSURANCE COMPANY
8711 FREEPORT PKWY N. MS#12
Attention: IRVING, TX 75063

If to Agency:

J Mark George Insurance Agency, Inc.
Cabot, AR 72023

or to such other person or address as any party may furnish or designate to the other in writing.

10

**XXI.    GENERAL PROVISIONS:**

A. Agency warrants and represents that Agency is a [corporation] [limited liability company] duly organized, validly existing and in good standing under the laws of the State of _Arkansas_ and has all requisite power and [corporate] [limited liability company] authority to enter into this Agreement and to perform Agency's duties and obligations under this Agreement. Agency further warrants and represents that it is duly qualified and in good standing to do business in every jurisdiction in which such qualification is necessary because of the nature of the business conducted by it pursuant to this Agreement.

B. Agency and Key Person warrant and represent that Agency and Key Person have the power, [corporate] [limited liability company] authority, and capacity to enter into and consummate this Agreement. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary [corporate] [limited liability company] action, as applicable, on the part of Agency and Key Person.

C. This Agreement may not be modified except by a written agreement between the Company and Agency which expressly states that it modifies this Agreement. No other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement. No representative of the Company will have authority to modify this Agreement, except as provided in this Section XXI. Nothing in this Section will affect the Company's right to amend the Supplement, EA Manual, and Agency Standards, as provided in Section I.C.

D. Agency acknowledges that it has reviewed the Supplement, EA Manual, and Agency Standards and that it has an ongoing responsibility to review all changes to the Supplement, EA Manual and Agency Standards issued by the Company and agrees to be bound by them.

E. References in this Agreement to the Supplement, EA Manual, and Agency Standards are references to the Supplement, EA Manual, and Agency Standards including any changes which may be made from time to time and distributed to Agency by the Company.

F. Agency acknowledges that it has read this Allstate R3001C Exclusive Agency Agreement, understands it, and agrees to be bound by its terms.

G. The authority granted to Agency under this Agreement is nonexclusive. The term "Exclusive" as used in the title of this Agreement refers to the obligations assumed by Agency under Section I.E.

H. The descriptive headings of this Agreement are intended for reference only and will not affect the construction or interpretation of this Agreement.

I. If any provision or part of this Agreement is held invalid for any reason, such invalidity will not affect any other provision or part of this Agreement not held invalid, and such remaining provisions and parts will remain in full force and effect.

J. The failure of either party to insist upon the performance of any of the terms of this Agreement in any one or more instances will not be construed as a waiver or relinquishment of the future performance of any such term. The obligation of the parties with respect to any such future performance will continue in full force and effect.

K. Nothing in this Agreement shall be construed to confer upon any person or entity other than the Company and Agency any rights under this Agreement.

L. This Agreement, and the obligations or rights hereunder, shall not be assignable by Agency except as provided by Section XVI. The rights and obligations of the parties to this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns.

M. This Agreement may be executed in counterparts, each of which will be deemed an original.

IN WITNESS WHEREOF, the Company and Agency have caused this Agreement to be executed by their authorized representatives and the parties hereby accept the terms of this Agreement.

ALLSTATE INSURANCE COMPANY

_____
(authorized representative)

_____8 - 1 - 2018_____
(date)

AGENCY

_J Mark George Insurance Agency, Inc_
(name)

_____
(Key Person)

_____8 - 1 - 2018_____
(date)

12

R3001C
APPENDIX A

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this _____ 1st _____ day of
__AUGUST_____, __2018__, by and between _John Mark Gonzer_____ (referred to in
this Agreement as "Service Provider"), and _J Mark Gonzer Insurance Agency Inc_____ (referred to in this
Agreement as "Agency"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement
(referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agency to act as its agent for the
purpose of receiving and accepting applications for insurance and for selling certain specified products of the
Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agency has agreed to maintain the confidentiality of the
Company's confidential information; and

WHEREAS, Agency has employed Service Provider to assist Agency in performing services under the agency
agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained,
the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties
agree as follows:

1. The terms "employed" or "employment" as referred to in this Agreement apply to any service provided by the
   Service Provider as an employee, independent contractor, or in any other capacity.

2. Service Provider acknowledges that while assisting Agency in performing services under the agency
   agreement, Service Provider will have access to or will have disclosed to him/her confidential information
   concerning the Company, the disclosure of which could be harmful to the Company.

3. Confidential information includes, but is not limited to, business plans of the Company; information regarding
   the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of
   policies; amounts of insurance; premium amounts; the description and location of insured property; the
   expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any
   privacy law; claim information; certain information and material identified by the Company as confidential or
   information considered a trade secret as provided herein or by law; and any information concerning any
   matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the
   public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4. Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to
   any third party or permit any third party to access any confidential information, except upon the written
   consent of the Company; nor will Service Provider use any confidential information for his/her own benefit,
   except for the purposes of assisting Agency in performing services under the agency agreement.

5. Any and all confidential information and all Company forms, manuals, records, and other materials and
   supplies furnished to Service Provider by Agency will at all times remain the property of the Company and
   will be returned to the Company at any time upon the demand of the Company or upon the termination of
   Service Provider's employment by Agency.

6. Upon the termination of Service Provider's employment by Agency, Service Provider agrees to treat as
   confidential and not disclose, either directly or indirectly, to any third party any confidential information of the
   Company.

1

R2459A/C-3   04/01/2008

7. For a period of one year following the termination of Service Provider's employment by Agency, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

   1. With respect to any person, company, or organization to whom Agency, or any person employed by Agency, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

   2. With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

   3. From any office or business site located within one mile of any locations from which Agency solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

   In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8. Upon the termination of Service Provider's employment with Agency, Service Provider will immediately cease and desist from any and all use of Company service marks and trade names. Service Provider will immediately return to Agency or the Company all property bearing any company service marks or trade names, or dispose of such materials in the manner specified by the Company. If requested by the Company, Service Provider will execute an Order of Transfer of Responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9. While employed by Agency, Service Provider agrees that he/she will not either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10. Service Provider recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Service Provider agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to an application for such order, except that the violation did not occur. Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11. This Agreement may be executed in counterparts, each of which will be deemed an original. This Agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto. The parties agree that the use of facsimile signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENCY | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| (Key Person as an individual) | (Key Person on behalf of Agency) | (authorized representative) |
| 8-1-2018 | 8-1-2018 | 8-1-2018 |
| (date) | (date) | (date) |

R2459A/C-3    04/01/2008

2

**R3001C**
**APPENDIX B**

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this _____ day of _____, _____, by and between _____ (referred to in this Agreement as "Service Provider"), and _____ (referred to in this Agreement as "Agency"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement (referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agency to act as its agent for the purpose of receiving and accepting applications for insurance and for selling certain specified products of the Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agency has agreed to maintain the confidentiality of the Company's confidential information; and

WHEREAS, Agency has employed Service Provider to assist Agency in performing services under the agency agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained, the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties agree as follows:

1. The terms "employed" or "employment" as applied to in this Agreement apply to any service provided by the Service Provider as an employee, independent contractor, or in any other capacity.

2. Service Provider acknowledges that while assisting Agency in performing services under the agency agreement, Service Provider will have access to and will have disclosed to him/her confidential information concerning the Company, the disclosure of which would be harmful to the Company.

3. Confidential information includes, but is not limited to, business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance or premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4. Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of the Company, nor will Service Provider use any confidential information for his/her own benefit, except for the purpose of assisting Agency in performing services under the agency agreement.

5. Any and all confidential information and all Company forms, manuals, records, and other materials and supplies furnished to Service Provider by Agency will at all times remain the property of the Company and will be returned to the Company at any time upon the demand of the Company or upon the termination of Service Provider's employment by Agency.

6. Upon the termination of Service Provider's employment by Agency, Service Provider agrees to treat as confidential and not disclose, either directly or indirectly, to any third party any confidential information of the Company.

1

R27394   04/01/2008

7. For a period of one year following the termination of Service Provider's employment by Agency, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

 1. With respect to any person, company, or organization to whom Agency, or any person employed by Agency, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

 2. With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

 3. From any office or business site located within one mile of any locations from which Agency solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

 In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8. Upon the termination of Service Provider's employment with Agency, Service Provider will immediately cease and desist from any and all use of Company service marks or trade names. Service Provider will immediately return to Agency or the Company all proprietary and Company service marks or trade names, or dispose of such materials in the manner specified by the Company. If requested by the Company, Service Provider will execute an Order of Transfer of responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9. While employed by Agency, Service Provider agrees that he/she will not either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10. Service Provider recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Service Provider agrees that in the event of such a breach by the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against such breach which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to the application for such order, except that the violation did not occur. Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11. This Agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto. The parties agree that the use of electronic signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENCY | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| (name) | (Key Person) | (authorized representative) |
| (date) | (date) | (date) |

2

R27394   04/01/2008

B8780

## ALLSTATE R3001C EXCLUSIVE AGENCY AGREEMENT

This Agreement is between ALLSTATE INSURANCE COMPANY and such affiliates and subsidiaries as are named in the Supplement for the R3001 Agreement (referred to in this Agreement as "the Company") and _J Mark George Insurance Agency, Inc._ (referred to in this Agreement as "Agency").

The Company and Agency agree as follows:

I.    **AUTHORITY:**

A.    Effective _8 - 1 , 2018_, the Company appoints Agency as its agent to represent the Company in the Exclusive Agency Program. Agency is authorized on behalf of the Company, during the term of this Agreement, to receive and accept, subject to such restrictions on binding authority as may be established by the Company, applications for insurance covering such classes of risks located in the state(s) of _Arkansas_ as the Company may from time to time authorize to be written. Agency is also authorized to sell products specified by the Company and through the companies specified in the Supplement for the R3001 Agreement (referred to in this Agreement as "Company Business"). The Company will own all business produced under the terms of this Agreement. Agency will not represent itself as having any authority other than that specifically granted to it by the Company. Agency will not alter any contract or incur any expense or obligation for the Company without prior written approval from the Company.

B.    This Agreement is the sole and entire agency agreement between the Company and Agency, and it supersedes and replaces any prior employment, agency, or other agreement between the Company and Agency and any of its officers, directors, shareholders, members, and employees. This Agreement also supersedes any prior oral statements and representations by the Company and any prior written statements and representations by the Company in letters, manuals, booklets, memoranda, or any other format.

C.    The Supplement for the R3001 Agreement ("Supplement") and the Exclusive Agency Independent Contractor Manual ("EA Manual"), and the Allstate Agency Standards ("Agency Standards") as they may be amended from time to time, are expressly incorporated in their entirety as part of this Agreement. The Company reserves the right to amend the Supplement, EA Manual, and Agency Standards at any time without prior notice to Agency, except that notice regarding changes to commission amounts will be given as indicated in Section XV.

D.    The relationship between the Company and Agency and its officers, directors, shareholders, members, employees, and other persons working in connection with this Agreement, will be that of an independent contractor for all purposes. Agency will not represent that it has authority to act on behalf of the Company or enter into any contract on behalf of the Company, except for contracts of insurance or other contracts as expressly authorized by this Agreement.

E.    Agency will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company. Agency may, however, write applications for insurance under an assigned risk, cooperative industry, or government established residual market plan or facility in accordance with the Company's rules and procedures.

1

R3001C-3    04/01/2008

F.  The Company will determine in its sole discretion all matters relating to its business and the operation of the Company including, but not limited to, the following:

   1.  The determination of contract forms and provisions, premiums, fees, and charges for insurance and other Company Business;

   2.  The acceptance or rejection of any application;

   3.  The termination or modification of any contract or the refusal to renew any contract;

   4.  The limitation, restriction, or discontinuance of the writing or selling of any policies, coverages, lines, or kinds of insurance or other Company Business;

   5.  The obtaining of any licenses of the Company or the Company's withdrawal from any state, jurisdiction, or territory; and

   6.  The type and quality of customer service received by Company policyholders.

G.  Agency represents and warrants that prior to the execution of this Agreement, Agency has provided to the Company the full names and addresses of its officers, directors and any persons who own any shares of or interest in Agency.  Thereafter, Agency shall promptly furnish to the Company the full names and addresses of any new officers, directors, or owners.

## II.  DUTIES AND CONDITIONS:

A.  Agency will act as an agent of the Company for the purpose of soliciting, selling, and servicing insurance and other Company Business in accordance with the provisions of this Agreement. As an agent of the Company, Agency will provide customer service, including the collection of payments, for any and all Company policyholders and will assist in claims administration in accordance with the Company's rules and procedures.

B.  Agency will meet certain business objectives established by the Company in the areas of profitability, growth, retention, customer satisfaction and customer service.  Agency will build and maintain a profitable book of business, assist the Company in its efforts to achieve market penetration for all forms of insurance offered by the Company and other Company Business, and service the Company's customers in a manner consistent with the Company's goodwill, reputation, and overall business strategy.

C.  Agency will record, transmit, and process insurance and Company Business in the manner prescribed in the then current provisions of the Supplement.

D.  Agency agrees to comply with any and all applicable federal, state, or local laws, rules, regulations and ordinances affecting its operation and warrants that Agency, its officers, directors, shareholders, members, and employees will maintain any required agent licenses in the state or states in which Agency is appointed to represent the Company.

E.  This Agreement is being entered into with Agency in reliance upon and in consideration of the skills, qualifications, and representations of _John Mark Goins_ (referred to in this Agreement as "Key Person").  Agency agrees that it will employ Key Person to provide services under this Agreement for its term.

F.  The Company recognizes that Agency may, in its sole discretion, arrange to have business conducted at its sales location in Key Person's absence by its other employees or other persons and that the time during which Key Person is physically present at Agency's sales location is entirely in Agency's sole discretion. Key Person must, however, remain actively involved in the conduct of business at Agency's sales location.

2

G. The Company shall at all times be entitled to conclusively rely upon the authority of Key Person (or in the event of the death or incapacity of Key Person, his executor or personal representative) to bind Agency and its officers, directors, shareholders and members, regardless of any directions received by the Company from any person or entity which conflict with directions received from Key Person, unless the Company is properly served with an order of a court of competent jurisdiction abrogating Key Person's authority and designating an alternate authorized representative to act on behalf of Agency under this Agreement.

H. Agency agrees that the Company will have the authority to use the name of Agency or Key Person and the Key Person's signature, or facsimile thereof, on policy documents and customer communication materials.

I. Agency agrees to maintain a professional business relationship with the Company, and, when requested, to meet with Company representatives at mutually convenient times to discuss various business topics. Agency also agrees that, because it is conducting business with the public under the Allstate name, Company representatives shall be permitted access to its sales location to review compliance with this Agreement during the business hours of that sales location.

J. Agency agrees that, as requested by the Company, it will demonstrate its knowledge of the Company products it is authorized to sell, as well as of federal, state, or local laws, rules, regulations and ordinances affecting its operation. If Agency is unable to demonstrate its knowledge of any product, the Company reserves the right to deny Agency the authority, or withdraw Agency's existing authority, to sell that product, until Agency demonstrates such knowledge.

## III. AGENCY EMPLOYEES:

A. Agency has no authority to employ persons on behalf of the Company, and no employee of Agency will be deemed to be an employee or agent of the Company, such employees at all times remaining Agency's employees. Agency has sole and exclusive control over its labor and employee relations policies, and its policies relating to wages, hours, and working conditions of its employees. Agency has the sole and exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, and discharge its employees.

B. Agency is solely responsible for all salaries and other compensation of all its employees and will make all necessary salary deductions and withholdings from its employees' salaries and other compensation. Agency is solely responsible for the payment of any and all contributions, taxes, and assessments, and all other requirements of the federal Social Security, federal and state unemployment compensation, and federal, state, and local withholding of income tax laws on all salary and other compensation of its employees.

C. Agency will comply with all other contracts, federal, state or local laws, ordinances, rules, or regulations regarding its employees, including federal or state laws or regulations regarding minimum compensation, overtime, and equal opportunities for employment. This includes, but is not limited to, Agency's warranty and agreement to comply with the terms of the federal and state civil rights acts, Age Discrimination in Employment Act, Americans With Disabilities Act, Occupational Safety and Health Act, Immigration Reform and Control Act, and the Fair Labor Standards Act.

D. Agency agrees and warrants that its employees, while working in connection with this Agreement, will comply with any and all applicable federal, state, or local laws, rules, regulations, and ordinances.

3

**IV.    COMPANY PROPERTY, CONFIDENTIALITY:**

A.  The Company will furnish Agency such signs, forms, manuals, records, and other materials and supplies as the Company deems advisable to assist Agency. All such property and information furnished by the Company will remain the property of the Company. In addition, the Company will offer, at Agency's expense, such additional materials and supplies as the Company feels may be helpful to Agency.

B.  Agency agrees that it will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information or any information containing trade secrets concerning any matters affecting or relating to the pursuits of the Company, except upon direct written authority of the Company. Furthermore, upon termination of this Agreement, Agency agrees to treat as confidential and not to disclose, either directly or indirectly, to any third party any confidential information or trade secrets of the Company.

C.  Agency agrees that it will not disclose or grant access to any confidential information or trade secrets to any of its employees or other persons providing services for it in connection with this Agreement, unless such employee or other person has signed a copy of the Confidentiality and Non-Competition Agreement, attached as Appendix A if Key Person and Appendix B if other than Key Person. Appendix B is a sample copy of the electronic version of the document that must be transmitted to the Company.

D.  Confidential information includes, but is not limited to: business plans of the Company; information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. All such confidential information is wholly owned by the Company. Such confidential information may be used by Agency only for the purposes of carrying out the provisions of this Agreement.

E.  Any confidential information or trade secrets recorded on paper, electronic data file, or any other medium, whether provided by the Company or by Agency, is the exclusive property of the Company, as is any such medium and any copy of such medium.

F.  Agency recognizes that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. Agency agrees that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

**V.    SALES LOCATION:**

A.  Agency may select its sales location, within a geographical area specified by the Company, subject to Company approval. Initially, Agency has selected the location at 1715 T P White Dr, Jacksonville AR 72076 and such sales location has been approved by the Company. Agency agrees that it will not establish any additional sales location without the prior written approval of the Company. Agency acknowledges that it has no exclusive territorial rights in connection with its sales location.

4

B.  Agency agrees to keep its sales location open for business as appropriate in the market to provide a proper level of customer service. As a minimum, Agency agrees to operate its sales location consistently with the Agency Standards.

C.  Agency is authorized to sell insurance offered by the Company and Company Business only in the state containing its sales location and other states in which Agency has been authorized to act as a Company agent.

## VI.  ADVERTISING:

A.  The Company will advertise its products and provide promotional material in accordance with its advertising policies. Agency may also advertise in its sole discretion, subject to the requirements in paragraph B. below.

B.  Agency will submit all signs and advertising copy, including, but not limited to, sales brochures, display advertisements in telephone directories, newspaper advertisements, radio and television commercials, electronic media displays, all sales promotional plans and devices, and all other materials to the Company for approval, if they use or contain any reference to any service mark or trade name of the Company. Agency will not use any such advertising material or sales promotional plan or device without obtaining prior written approval from the Company. The Company has the right to disapprove any or all of the aforesaid advertising forms and other materials insofar as they, in the exclusive judgment of the Company, do not conform to Company policy regarding use of Company service marks or trade names; may subject the Company to liability or loss of goodwill; may damage the reputation of the Company or Company customer relations; may fail to adhere to the requirements of any federal, state, or local governmental rules, regulations, or laws; may fail to conform to community or Company standards of good taste and honest dealing; or may be detrimental to the business interests of the Company.

## VII.  SERVICE MARK AND TRADE NAME PROTECTION:

A.  Agency agrees to cooperate fully in the quality control program conducted by the Company relating to the use of its service marks and trade names and the nature and quality of services rendered and goods distributed under its service marks and trade names. The Company will have the right to specify, delineate, or limit the services or goods in connection with which Agency may use any of its service marks or trade names. In the event that the nature or the quality of the services or goods in connection with which Agency uses any of the service marks or trade names of the Company is not acceptable to the Company, then the Company will have the right to require Agency to institute appropriate procedures to correct any deficiencies noted by the Company.

B.  Agency agrees, at the request and expense of the Company, to assist the Company in protecting and enforcing the rights of the Company in and to any and all of its service marks and trade names which Agency may then be using.

C.  Agency will not in any manner encumber, alienate, license, or transfer to any other entity any right whatsoever concerning the service marks or trade names the Company authorizes the Agency to use in the performance of this Agreement, except as permitted in Section XVI.

5

D. Agency recognizes that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. Agency agrees that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

## VIII. EXPENSES:

Agency will be responsible for the payment of all expenses that it incurs in the performance of this Agreement including, but not limited to: expenses for its sales location, supplies not furnished by the Company, compensation of its employees or other assisting persons whom it engages, telephone, postage, and advertising expenses incurred at its direction, and all other charges and expenses.

## IX. TELEPHONE:

All telephone numbers used in connection with business conducted pursuant to this Agreement are the property of the Company.

## X. INDEMNIFICATION:

A. The Company will defend and indemnify Agency against liability, including the cost of defense and settlements, imposed on Agency by law for damages sustained by policyholders and caused by acts or omissions of the Company, provided that Agency has not caused or contributed to cause such liability by its acts or omissions. Agency agrees, as a condition to such indemnification, to notify the Company promptly of any claim or suit against it and to allow the Company to make such investigation, settlement, or defense as the Company deems prudent. The Company reserves the right to select counsel to represent Agency in connection with any such claim or suit. Agency also agrees to cooperate fully with the Company in any such investigation, settlement, or defense.

B. Agency will indemnify the Company against liability, including the cost of defense and settlements, imposed on the Company by law for damages sustained by any person and caused by the acts or omission of Agency, its officers, directors, shareholders, members, employees, including Key Person or other persons working in connection with this Agreement, provided that the Company has not caused or contributed to cause such liability by its acts or omissions. The Company agrees, as a condition to such indemnification, to notify Agency promptly of any such claim or suit against the Company. The Company reserves the right to select counsel to represent it in connection with any such claim or suit and to make such investigation or settlement as the Company deems prudent.

## XI. INSURANCE:

A. Agency agrees that it will, at its sole expense, obtain and maintain during the term of this Agreement policies of insurance as described in the EA Manual, as may be amended from time to time. Such policies must be obtained from companies satisfactory to the Company and must be adequate to protect against all expenses, claims, actions, liabilities, and losses related to the subjects covered by the required policies.

B. Where specified, each policy must name the Company as an additional insured and must contain a severability of interest/cross liability endorsement. Each policy must also expressly provide that it will not be subject to material change or cancellation without at least thirty (30) days prior written notice to the Company.

6

C.  Agency must furnish the Company with proof of insurance upon request by the Company.  If, in the Company's opinion, such policies do not afford adequate protection for the Company, the Company will so advise Agency and if Agency does not furnish evidence of acceptable coverage within fifteen (15) days after being requested to do so by the Company, the Company will have the right to obtain additional insurance at Agency's expense and deduct the cost of such insurance plus a processing fee from monies owed Agency by the Company.

## XII.    FINANCIAL INFORMATION:

Agency shall maintain all books and records relating to the business under this Agreement including, but not limited to, all checkbooks, check registers, deposit receipts, and general ledgers for a period of not less than five years after the close of the fiscal year to which they relate.  All of the foregoing records shall be open and available for inspection or audit at any time during Agency business hours without notice by the Company or its designated auditors and Agency shall have the duty to cooperate fully with the party(ies) making such inspection or audit.

## XIII.   POLICIES IN AGENCY'S ACCOUNT:

Policies which are credited to Agency's account are described in the Supplement.  While this Agreement is in effect, the Company will leave in Agency's account all policies credited to such account so long as the policyholder resides within a state in which Agency is authorized to act as a Company agent, except that the Company may remove any policy from Agency's account at the request of a policyholder.

## XIV.    MONEY COLLECTED BY AGENCY:

All payments collected or received by Agency in the performance of this Agreement are the property of the Company, will be treated as trust funds, and will be promptly transmitted to the Company without deduction for any purpose in the manner specified by the Company.  Agency must maintain accurate records and current remittance reports which may be inspected by the Company at any time without notice and which shall be submitted to the Company in accordance with its rules and procedures.

## XV.     COMPENSATION:

A.  The sole compensation to which Agency will be entitled for services rendered pursuant to this Agreement will be the commissions set forth in the Supplement, as may be amended from time to time.  All commissions will be paid solely to the Agency, except as described in Section XIX. below.  The Company will pay Agency its commissions at the time and in the manner set forth in the Supplement.  However, due to the inherent uncertainty of business conditions, the Company reserves the right to increase or decrease any commission amounts and to change the commission rules.  If the Company changes commission amounts, it will provide Agency with written notice of the changes at least ninety (90) days prior to the date on which they are to become effective.

B.  The Company may provide Agency with such bonuses, awards, prizes, and other remuneration based on performance, if any, as it may prescribe in its sole discretion.

C.  If any application for insurance is rejected, or any policy is surrendered or canceled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium is reduced or any overpayment made to Agency, or if any premium paid is not earned by the Company, the commissions paid to Agency on the amount returned or credited to the policyholder, or the amount overpaid to Agency, will constitute an indebtedness of the Agency to the Company and will be charged to Agency or recovered from Agency by reducing any future commissions, awards, or bonuses due Agency.

7

**XVI.   TRANSFER OF INTEREST:**

A.   Agency may not execute a transfer of its interest in this Agreement without the prior written approval of the Company.  A transfer of interest in this Agreement is described in the Supplement and EA Manual and includes, but is not limited to, any sale, merger, or assignment, in whole or in part, directly, indirectly, or contingently, of this Agreement or any rights or obligations under it.  Neither Agency, nor any shareholder or member of Agency, shall transfer any shares or interest in Agency, including, but not limited to, any sale, assignment, conveyance, or the granting of any lien, security interest, pledge, or mortgage thereof, without the prior written approval of the Company.  Agency has the obligation to notify the Company of a proposed transfer and to request Company approval.

B.   Agency has an economic interest, as defined in this Agreement and the incorporated Supplement and EA Manual, in its Allstate customer accounts developed under this Agreement.  Subject to the terms and conditions set forth in this Agreement and the incorporated Supplement and EA Manual, Agency may transfer its entire economic interest in the business written under this Agreement upon termination of this Agreement by selling the economic interest in the business to an approved buyer.  The Company retains the right in its exclusive judgment to approve or disapprove such a transfer.  Any failure to disclose and obtain the prior written approval of the Company for any transfer of Agency's interest in this Agreement or any share or interest in Agency shall constitute a breach of this Agreement and cause for termination of this Agreement.

C.   Approval of a proposed transfer of Agency's entire interest in this Agreement will be conditioned upon the termination of this Agreement and the execution of a then current agency agreement by the proposed transferee.

D.   Policies in Agency's account (Section XIII. above) will be transferred to an approved transferee.

**XVII.  TERMINATION OF AGREEMENT:**

A.   This Agreement will be terminated automatically:

1.   On the effective date of any transfer of Agency's entire interest in this Agreement, whether approved or not, as described in Section XVI. above;

2.   Upon the death or permanent incapacity of Key Person;

3.   On the date Key Person ceases to be employed by Agency;

4.   Upon the loss of any required agent license of Agency or Key Person;

5.   Upon the dissolution of Agency; or

6.   Upon the surrender of, or the election not to renew, the Company's license to sell insurance in all lines in the state in which Agency's sales location is located or the discontinuation of the sale of insurance in the state.

B.   This Agreement may be terminated:

1.   At any time by mutual agreement of the parties in writing;

2. By either party, with or without cause, upon providing ninety (90) days prior written notice to the other, or such greater number of days as is required by law. Once written notice of termination has been given by either party, Agency will, immediately upon request of the Company, cease to act or to represent itself in any way as an agent or representative of the Company, but it will receive compensation pursuant to Section XV. from the Company for the period up to and including the specified termination date; or

3. Alternatively, by the Company, with cause, immediately upon providing written notice to Agency. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

## XVIII.  OBLIGATIONS UPON TERMINATION OF AGREEMENT:

Except as otherwise provided in a subsequent agreement between Agency and the Company, upon termination of this Agreement, Agency agrees that:

A.  Agency will not act or represent itself in any way as an agent or representative of the Company.

B.  Agency will immediately return all property belonging to the Company, or dispose of it in such manner as the Company specifies.

C.  Agency will immediately cease to use such telephone numbers referenced in Section IX. above and execute an Order of Transfer of Responsibility for such numbers in its or Key Person's name to the Company or to any party the Company designates, and Agency will immediately notify the telephone company of any such transfer. Agency will be responsible for all charges incurred up to the date of execution of the transfer.

D.  For a period of one year following termination, neither Agency, nor any of its officers, directors, shareholders, members, or employees, including Key Person or any other persons working in connection with this Agreement, will solicit the purchase of products or services in competition with those sold by the Company:

1. With respect to any person, company, or organization to whom Agency or anyone acting on its behalf sold insurance or other products or services on behalf of the Company and who is a customer of the Company at the time of termination of the Agreement;

2. With respect to any person, company, or organization who is a customer of the Company at the time of termination of this Agreement and whose identity was discovered as a result of Agency's status as a Company agent or as a result of Agency's access to confidential information of the Company; or

3. From any office or business site located within one mile of the agency sales location maintained pursuant to Section V. of this Agreement at the time this Agreement is terminated.

In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph D. conflicts with any existing law, it will be applied to the extent permitted by such law.

E.  Agency will immediately cease and desist from any and all use of Company service marks and trade names. Agency will immediately return to the Company all property in its possession or under its control bearing any Company service mark or trade name, or dispose of it in such manner as the Company specifies.

9

F.  Agency recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure.  Agency agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur.  Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

G.  Agency recognizes and acknowledges that each of the foregoing provisions of this Section XVIII. is reasonable and necessary to protect and preserve the legitimate business interests of the Company, its present and potential business activities, and the economic benefits derived therefrom.  Agency and Key person recognize and acknowledge that the foregoing provisions are not an undue restraint on Agency or Key Person.

## XIX.  PAYMENT TO AGENCY UPON DISSOLUTION:

If at any time following the Company's receipt of notice of Agency's dissolution, the Company shall be obligated under this Agreement to pay money to Agency, the Company is irrevocably authorized to pay such money to Key Person, or in the event of the death or incapacity of Key Person, his executor or personal representative, who shall be responsible to Agency's successors-in-interest for distribution of such payment to the persons or entities legally entitled thereto.  Company shall have no liability whatsoever for any payments made pursuant to the foregoing authority regardless of whether Company has received any conflicting demand from any other person or entity, except for payments made by the Company in violation of an order of a court of competent jurisdiction properly served upon the Company which directs the Company not to make any such payment to Key Person and designates an alternate person or entity to which the Company is directed to make such payments.

## XX.  NOTICE:

All notices will be deemed to have been given if personally delivered, sent by facsimile transmission, or mailed as follows:

If to the Company:             Allstate Insurance Company
                               ALLSTATE INSURANCE COMPANY
                               8711 FREEPORT PKWY N. MS#12
                               Attention: IRVING, TX 75063

If to Agency:                  J Mark Going Insurance Agency, Inc
                               Cabot, AR 72023

or to such other person or address as any party may furnish or designate to the other in writing.

10

## XXI.  GENERAL PROVISIONS:

A. Agency warrants and represents that Agency is a [corporation] [limited liability company] duly organized, validly existing and in good standing under the laws of the State of _Arkansas_ and has all requisite power and [corporate] [limited liability company] authority to enter into this Agreement and to perform Agency's duties and obligations under this Agreement. Agency further warrants and represents that it is duly qualified and in good standing to do business in every jurisdiction in which such qualification is necessary because of the nature of the business conducted by it pursuant to this Agreement.

B. Agency and Key Person warrant and represent that Agency and Key Person have the power, [corporate] [limited liability company] authority, and capacity to enter into and consummate this Agreement. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary [corporate] [limited liability company] action, as applicable, on the part of Agency and Key Person.

C. This Agreement may not be modified except by a written agreement between the Company and Agency which expressly states that it modifies this Agreement. No other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement. No representative of the Company will have authority to modify this Agreement, except as provided in this Section XXI. Nothing in this Section will affect the Company's right to amend the Supplement, EA Manual, and Agency Standards, as provided in Section I.C.

D. Agency acknowledges that it has reviewed the Supplement, EA Manual, and Agency Standards and that it has an ongoing responsibility to review all changes to the Supplement, EA Manual and Agency Standards issued by the Company and agrees to be bound by them.

E. References in this Agreement to the Supplement, EA Manual, and Agency Standards are references to the Supplement, EA Manual, and Agency Standards including any changes which may be made from time to time and distributed to Agency by the Company.

F. Agency acknowledges that it has read this Allstate R3001C Exclusive Agency Agreement, understands it, and agrees to be bound by its terms.

G. The authority granted to Agency under this Agreement is nonexclusive. The term "Exclusive" as used in the title of this Agreement refers to the obligations assumed by Agency under Section I.E.

H. The descriptive headings of this Agreement are intended for reference only and will not affect the construction or interpretation of this Agreement.

I. If any provision or part of this Agreement is held invalid for any reason, such invalidity will not affect any other provision or part of this Agreement not held invalid, and such remaining provisions and parts will remain in full force and effect.

J. The failure of either party to insist upon the performance of any of the terms of this Agreement in any one or more instances will not be construed as a waiver or relinquishment of the future performance of any such term. The obligation of the parties with respect to any such future performance will continue in full force and effect.

K. Nothing in this Agreement shall be construed to confer upon any person or entity other than the Company and Agency any rights under this Agreement.

L.  This Agreement, and the obligations or rights hereunder, shall not be assignable by Agency except as provided by Section XVI. The rights and obligations of the parties to this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns.

M.  This Agreement may be executed in counterparts, each of which will be deemed an original.


IN WITNESS WHEREOF, the Company and Agency have caused this Agreement to be executed by their authorized representatives and the parties hereby accept the terms of this Agreement.

ALLSTATE INSURANCE COMPANY

_____
(authorized representative)

8-1-2018
(date)

AGENCY

_____
(name)

_____
(Key Person)

8-1-2018
(date)

12

R3001C
**APPENDIX A**

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this _____ 1st _____ day of
_____ AUGUST _____, _____ 2018 _____, by and between _____ Dina Mark Goolsi _____ (referred to in
this Agreement as "Service Provider"), and _____ J Mark Goolsi Insurance Agency Inc _____ (referred to in this
Agreement as "Agency"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement
(referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agency to act as its agent for the
purpose of receiving and accepting applications for insurance and for selling certain specified products of the
Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agency has agreed to maintain the confidentiality of the
Company's confidential information; and

WHEREAS, Agency has employed Service Provider to assist Agency in performing services under the agency
agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained,
the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties
agree as follows:

1.  The terms "employed" or "employment" as referred to in this Agreement apply to any service provided by the
    Service Provider as an employee, independent contractor, or in any other capacity.

2.  Service Provider acknowledges that while assisting Agency in performing services under the agency
    agreement, Service Provider will have access to or will have disclosed to him/her confidential information
    concerning the Company, the disclosure of which could be harmful to the Company.

3.  Confidential information includes, but is not limited to, business plans of the Company; information regarding
    the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of
    policies; amounts of insurance; premium amounts; the description and location of insured property; the
    expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any
    privacy law; claim information; certain information and material identified by the Company as confidential or
    information considered a trade secret as provided herein or by law; and any information concerning any
    matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the
    public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4.  Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to
    any third party or permit any third party to access any confidential information, except upon the written
    consent of the Company; nor will Service Provider use any confidential information for his/her own benefit,
    except for the purposes of assisting Agency in performing services under the agency agreement.

5.  Any and all confidential information and all Company forms, manuals, records, and other materials and
    supplies furnished to Service Provider by Agency will at all times remain the property of the Company and
    will be returned to the Company at any time upon the demand of the Company or upon the termination of
    Service Provider's employment by Agency.

6.  Upon the termination of Service Provider's employment by Agency, Service Provider agrees to treat as
    confidential and not disclose, either directly or indirectly, to any third party any confidential information of the
    Company.

1

R2459A/C-3    04/01/2008

7.  For a period of one year following the termination of Service Provider's employment by Agency, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

1.  With respect to any person, company, or organization to whom Agency, or any person employed by Agency, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

2.  With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

3.  From any office or business site located within one mile of any locations from which Agency solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8.  Upon the termination of Service Provider's employment with Agency, Service Provider will immediately cease and desist from any and all use of Company service marks and trade names. Service Provider will immediately return to Agency or the Company all property bearing any company service marks or trade names, or dispose of such materials in the manner specified by the Company. If requested by the Company, Service Provider will execute an Order of Transfer of Responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9.  While employed by Agency, Service Provider agrees that he/she will not either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10.  Service Provider recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Service Provider agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to an application for such order, except that the violation did not occur. Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11.  This Agreement may be executed in counterparts, each of which will be deemed an original. This Agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto. The parties agree that the use of facsimile signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENCY | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| (Key Person as an Individual) | (Key Person on behalf of Agency) | (authorized representative) |
| 8 - 1 - 2018 | 8 - 1 - 2018 | 8 - 1 - 2018 |
| (date) | (date) | (date) |

2

R2459A/C-3    04/01/2008

R3001C
APPENDIX B

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this _____ day of _____, _____, by and between _____ (referred to in this Agreement as "Service Provider"), and _____ (referred to in this Agreement as "Agency"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement (referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agency to act as its agent for the purpose of receiving and accepting applications for insurance and for selling certain specified products of the Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agency has agreed to maintain the confidentiality of the Company's confidential information; and

WHEREAS, Agency has employed Service Provider to assist Agency in performing services under the agency agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained, the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties agree as follows:

1. The terms "employed" or "employment" as applied to in this Agreement apply to any service provided by the Service Provider as an employee, independent contractor, or any other capacity.

2. Service Provider acknowledges that while assisting Agency in performing services under the agency agreement, Service Provider will have access to or will have disclosed to him/her confidential information concerning the Company, the disclosure of which could be harmful to the Company.

3. Confidential information includes, but is not limited to, business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance or premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy laws; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4. Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of the Company, nor will Service Provider use any confidential information for his/her own benefit, except for the purpose of assisting Agency in performing services under the agency agreement.

5. Any and all confidential information and all Company forms, manuals, records, and other materials and supplies furnished to Service Provider by Agency will at all times remain the property of the Company and will be returned to the Company at any time upon the demand of the Company or upon the termination of Service Provider's employment by Agency.

6. Upon the termination of Service Provider's employment by Agency, Service Provider agrees to treat as confidential and not disclose, either directly or indirectly, to any third party any confidential information of the Company.

1

R27394    04/01/2008

7. For a period of one year following the termination of Service Provider's employment by Agency, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

   1. With respect to any person, company, or organization to whom Agency, or any person employed by Agency, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

   2. With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

   3. From any office or business site located within one mile of any locations from which Agency solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

   In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8. Upon the termination of Service Provider's employment with Agency, Service Provider will immediately cease and desist from any and all use of Company service marks and trade names. Service Provider will immediately return to Agency or the Company all property bearing any Company service marks or trade names, or dispose of such materials in the manner specified by the Company. If requested by the Company, Service Provider will execute an Order of Transfer of responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9. While employed by Agency, Service Provider agrees that he/she will not either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10. Service Provider recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Service Provider agrees that in the event of any such breach the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against a breach which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to any application for such order, except that the violation did not occur. Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11. This Agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto. The parties agree that the use of electronic signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENCY | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| (name) | (Key Person) | (authorized representative) |
| (date) | (date) | (date) |

2

Username: BENESCH\mdominguez





Date: 3/19/2024
Time: 12:57:34 PM

# **<u>EXHIBIT B</u>**



# GILL
# RAGON
# OWEN

A T T O R N E Y S

GILL RAGON OWEN, P.A.
ATTORNEYS AT LAW
425 WEST CAPITOL AVENUE, SUITE 3800
LITTLE ROCK, ARKANSAS 72201
TELEPHONE 501.376.3800
FACSIMILE 501.372.3359
www.gill-law.com

HEARTSILL RAGON | ATTORNEY
EMAIL: ragon@gill-law.com

February 9, 2024

J. Scott Humphrey
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606
shumphrey@beneschlaw.com

RE:  Violation of Allstate R3001C Exclusive Agency Agreement

Dear Mr. Humphrey:

I serve as legal counsel to John Mark Goings and I have reviewed your letter dated February 5, 2024.  Please be advised that Mr. Goings is completely aware of his confidential information and noncompetition obligations.  You state that Mr. Goings has apparently ignored these duties and obligations by soliciting customers.  Could you please provide us with the names of the customers in question and all other facts and circumstances in support of your claims?  Candidly, Mr. Goings does not believe that any violations of his agreement have occurred.

Look forward to your thoughts or comments.

Sincerely yours,

Heartsill Ragon III

cc: client